## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: EXACTECH POLYETHYLENE ORTHOPEDIC PRODUCTS LIABILITY LITIGATION | **MDL No. 3044**<br>**Case No. 22-md-3044 (NGG) (MMH)** |
| JAMES MCNAIR AND ELDORADO MCNAIR, | **DIRECT FILED COMPLAINT** |
| *Plaintiffs*, | **PURSUANT TO AMENDED**<br>**PRACTICE AND PROCEDURE** |
| v. | **ORDER NO. 2** |
| EXACTECH, INC. AND EXACTECH U.S., INC. | |
| *Defendants*. | |
| Case No.: _____ | |

NOW COMES Plaintiffs JAMES MCNAIR and ELDORADO MCNAIR (hereafter collectively referred to as "Plaintiffs"), by and through the undersigned attorneys, and bring this action against EXACTECH, INC. ("EXACTECH"), EXACTECH U.S., INC. ("EXACTECH US") (hereinafter collectively as "Defendants"), for personal injuries suffered as a proximate result of the implantation of the Optetrak Comprehensive Total Knee System (hereinafter referred to as the "Device" or "Devices") and allege as follows:

### NATURE OF THE ACTION

1.      This is an action for damages relating to Defendants' developing, designing, testing, assembling, manufacturing, packaging, monitoring, labeling, preparing, distributing, marketing, supplying, storing, and/or selling of the Optetrak Device. The Optetrak Devices as referred to in this Complaint includes the Optetrak Polyethylene Tibial Insert.

2.      Thousands of patients, like Plaintiff JAMES MCNAIR, have been, and/or will be, required to undergo extensive revision surgery to remove and replace defective Devices due to a recent recall of these devices which first revealed to patients and surgeons that the polyethylene components within the prosthesis prematurely degrades over time causing an inflammatory response resulting in bone necrosis (death) also known as osteolysis.  The recall notice admits that the recall and problems arose from failure to properly package the polyethylene insert component of the Optetrak Devices.

3.      As a result of Defendants' failure to properly package the Devices prior to distribution, the polyethylene liner prematurely degraded and Plaintiff required revision surgery due to severe pain, swelling, and instability in the knee and leg.  These injuries were caused by early and preventable wear of the polyethylene insert and resulting component loosening and/or other failures causing serious complications including tissue damage, osteolysis, permanent bone loss and other injuries.

4.      Recipients of the Device, like the Plaintiff, have been required to undergo revision surgeries well before the estimated life expectancy of a knee implant and at a much higher rate than should reasonably be expected for devices of this kind and have suffered pain and disability leading up to and after the revision surgery.

5.      Despite knowledge that the Device was defective and resulted in premature failures and accompanying complications, Defendants only first issued a nationwide recall on February 7, 2022, advising the public that "most of our inserts since 2004 were packaged in out-of-specification . . . vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance."

6.      As a direct and proximate result of the defective nature of Defendants' Devices

surgically implanted in Plaintiff which necessitated premature removal, Plaintiff JAMES MCNAIR suffered and will continue to suffer serious personal injuries, including pain, impaired mobility, rehabilitation, medical care, loss of enjoyment of life, and other medical and non-medical sequalae.

7.     Plaintiffs bring this action for personal injuries suffered as a proximate result of failure of the Device. Plaintiffs accordingly seek compensatory and punitive damages, and all other available remedies provided to Plaintiffs under the law because of injuries JAMES MCNAIR sustained due to the Defendants' negligent, reckless, and wrongful conduct.

<u>**JURISDICTION & VENUE**</u>

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and because there is complete diversity of citizenship between the Plaintiffs and all Defendants.

9.     The court has personal jurisdiction over Defendants because at all relevant times they have engaged in substantial business activities in the State of New York. At all relevant times, Defendants transacted, solicited, and conducted business in New York through their employees, agents, and/or sales representatives, and derived substantial revenue from such business in New York.

10.     Venue is proper in the original district court and division pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred within this District and Plaintiff is a citizen and resident of Nassau County, New York

<u>**THE PARTIES**</u>

11.     Plaintiffs JAMES MCNAIR AND ELDORADO MCNAIR are residents and citizens of Westbury, New York.

12.     Defendant EXACTECH, INC. is a domestic, Florida corporation with its principal

place of business located at 2320 NW 66th Court, Gainesville, Florida 32653.

13.    Defendant EXACTECH, INC. develops, manufactures, packages, stores, distributes, markets, and sells orthopedic implant devices, including Optetrak Devices and related surgical instrumentation throughout the United States, including in and throughout the United States and the State of New York.

14.    Defendant EXACTECH, INC. manufactured the Devices implanted in Plaintiff JAMES MCNAIR.

15.    At all times relevant to this action, Defendant EXACTECH, INC. tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Device in interstate commerce and throughout the State of New York and generated substantial revenue as a result.

16.    Defendant EXACTECH U.S., INC., a wholly owned subsidiary of Defendant EXACTECH, INC., is a domestic Florida corporation with its principal place of business located at 2320 NW 66th Court, Gainesville, Florida 32653.

17.    According to public filings, Defendant EXACTECH U.S., INC., conducts Defendants' U.S. sales and distribution activities.

18.    EXACTECH U.S., INC. is engaged in the business of designing, developing, testing, assembling, selecting, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting, selling, and introducing Defendants' products, including Optetrak Devices, into commerce throughout the United States and the State of New York.

19.    Upon information and belief, the Devices manufactured by Defendant EXACTECH, INC. were distributed by Defendant EXACTECH U.S., INC. throughout the United States, including to the Hospital for Special Surgery (HSS) in New York, New York, where

4

Plaintiff JAMES MCNAIR received his implants.

20.    At all times relevant to this action, Defendant EXACTECH U.S., INC. tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, stored, promoted, advertised, marketed, distributed, and/or sold the Device in interstate commerce and throughout the State of New York and generated substantial revenue as a result.

### FACTUAL BACKGROUND

21.    Upon information and belief, the first Optetrak total knee system was available for implantation in 1994, building upon technology licensed from HSS.

22.    At all times material hereto, Defendants designed, developed, tested, assembled, selected, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, warranted, and/or sold the Optetrak Comprehensive Total Knee System to hospitals in many states, including to the Hospital for Special Surgery in New York, New York.

23.    Between 1994 and 2015, Defendants obtained 510(k) clearance from the Food and Drug Administration ("FDA") for various Optetrak total knee system devices and components, including the OPTETRAK LOGIC® knee system and Optetrak Logic PSC Tibial Insert.

24.    The Optetrak Total Knee System is classified as a knee joint patellofemorotibial polymer/metal/polymer semi-constrained cemented prosthesis. It features a mix of polyethylene and metal-based components.

25.    According to Defendants, the Optetrak Device introduced "novel implants and instruments to make the total knee procedure easier, faster, and more consistent, improving patient satisfaction for a more diverse population requiring total knee replacements.

26.    510(k) clearance is distinct from the FDA's pre-market approval ("PMA") process in that clearance does not require clinical confirmation of safety and effectiveness and as such the manufacturer retains all liability for the assertions of safety and effectiveness.

27.    510(k) clearance only requires the manufacturer to notify the FDA under Section 510(k) of the Medical Device Amendments of 1976 to the Food Device Cosmetic Act (MDA) of its intent to market a device at least ninety days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then "clear" the new device for sale in the United States.

28.    All the component parts comprising Plaintiff's Device were cleared for marketing by the FDA pursuant to 510(k) process or were marketed without receiving either 510(k) clearance or PMA approval by the FDA.

29.    The Device is comprised of the following parts: a patellar cap, femoral cap, tibial insert and tibial tray, as shown below.



30.    The patellar cap and tibial insert are made of polyethylene.

31.    Defendants touted the Optetrak Device as being first-in-class in their product brochures.

32.    In their marketing materials, the Defendants promised that the Device had excellent long-term clinical outcomes and that "surgeons and patients can have every confidence in the performance and longevity of the Optetrak knee system."

6

33.    Defendants promoted their Optetrak Devices as a system with nearly three decades of clinical success and proven outcomes for patients around the world because of an improved articular design resulting in low polyethylene stresses.

34.    However, Optetrak Devices have performed poorly when compared to their competitors. For example, the Australian Orthopaedic Association, a preeminent, internationally recognized orthopedic implant registry, has identified the Optetrak as an implant with a higher-than-expected rate of revision.

35.    According to the 2020 Australian National Joint Replacement Registry, the rate of revision for a total knee replacement utilizing an Optetrak tibial component with a Optetrak-CR femoral component was 8.5% at ten years and 10.2% at ten years when implanted with a Optetrak-PS femoral component, which far exceeds international guidelines for accepted revision rates.

36.    Per the recommendations established by the International Benchmarking Working Group and applied by the Australian Orthopaedic Association, the Optetrak Devices do not qualify for a "superiority benchmark" or even a "non-inferiority benchmark."

37.    At all times relevant, Defendants have been aware of a high rate of early failures associated with the Optetrak Device.

38.    Upon information and belief, by 2012, Defendants had further clinical evidence that Optetrak Devices were failing at a rate higher than promoted. Reports in the Manufacturer and User Facility Device Experience (MAUDE) indicate instances of revision due to "loose tibial component," "aseptic loosening," "pain and visible loosening," "polyethylene deformation," "polyethylene worn," and "pain, limited mobility, knee swelling and sensitivity" due to "loose" joint.

39.     Upon information and belief, in 2013, complaints continued to be reported. Some examples include revision for "tibial loosening" just two years postoperatively, "revision due to tibial loosening," "during revision, the tibial component was found to be loose and easily removed," "revision of knee component due to loosening," and "revision due to pain and loosening."

40.     Upon information and belief, the complaints of early onset failures continued in 2014. Some examples include "revision due to tibial loosening," "tibial loosening," "revision of optetrak knee components due to tibial loosening," "revision due to pain and loosening," "revision of optetrak knee components due to aseptic loosening," several reports described as "revision of knee components due to tibial loosening," and "revision of optetrak knee components reportedly due [to] aseptic loosening."

41.     The general practice in orthopedic implant surgeries generally, and with Exactech implants specifically, is for the sale representative of the manufacturer, in this case Exactech's authorized representative and agent, hereinafter "the sales rep," to be present at the time of surgery to provide implant components to the surgeon, relieving the hospital of the responsibility for having on stock all potential sizes and components that may be needed in surgeries.  This practice includes the original implant surgery and any revision surgery.

42.     The sales reps of Exactech observed many instances of premature failures of the Device with plain evidence upon revision of polyethylene debris that needed to get removed, a/k/a "debrided," visible bone loss or osteolysis and plainly loose components that were easy to remove due to lack of fixation. Often these sales reps would take the component from the surgeon to return to the company for inspection and analysis.

43.    The sales reps of Exactech were under a duty to report these findings to the engineering and medical departments of Exactech who were under a duty to then do an investigation, analyze the removed component when available, also known as "retrieval analysis," and honestly and thoroughly report such findings to the FDA and the surgeons.

44.    Despite Defendants' knowledge of early onset failures of the Optetrak Device, Defendants continued to manufacture, promote, and distribute the Device without alerting surgeons, patients, or the FDA of the potential increased risks of early onset failures of the Optetrak Device.

45.    Defendants never changed the labeling, marketing materials, or product inserts to adequately and accurately warn patients or physicians of the associated increased risks of early failure due to loosening and/or polyethylene wear.

46.    Not until August 30, 2021 did the Defendants take some action and issue a partial recall of all Optetrak All-polyethylene tibial components, including the OPTETRAK All-polyethylene CC Tibial Components; OPTETRAK All-polyethylene CR Tibial Components; OPTETRAK All-polyethylene CR Tibial Sloped Components; OPTERAK All-polyethylene PS Tibial Components; OPTETRAK HI-FLEX PS Polyethylene Tibial Components; OPTETRAK Logic All-polyethylene CR Tibial Components; OPTETRAK Logic All-polyethylene CRC Tibial Components; OPTETRAK Logic All-polyethylene PSC Tibial Components; OPTETRAK Logic Modular PS Tibial Components; OPTETRAK Logic RBK PS Tibial Components; TRULIANT CR Tibial Inserts; TRULIANT CRC Tibial Inserts; TRULIANT PS Tibial Inserts; and TRULIANT PSC Tibial Inserts.

47.    In issuing the August 2021 partial recall, Defendants stated that inserts were packaged in vacuum bags that lacked an additional oxygen barrier layer. *See Class 2 Device Recall*

*OPTETRAK Comprehensive Knee System*, FDA (Oct. 4, 2021), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRes/res.cfm?ID=189266 (last visited Jan. 21, 2023).

48.    According to the FDA website, "Exactech began notification to distributors and sales representatives on about 08/30/2021 via letter titled "URGENT MEDICAL DEVICE RECALL." Actions being taken by Exactech included removing all Knee and Ankle UHMWPE products labeled with an 8-year shelf life and not packaged in EVOH/Nylon bags. This will be performed in a phased approach over the next 12 months. Phase 1 includes immediately return all knee and ankle UHMWPE devices labeled with an 8-year shelf life that will be 5 years old or older by 08/31/2022 not packaged in EVOH/Nylon bags. Phase 2 includes, between 05/31/2022 to 08/31/2022, returning all remaining knee and ankle UHMWPE devices labeled with an 8-year shelf life not packaged in EVOH/Nylon bags." *Id.*

49.    Despite initial communications with distributors and sales representatives, Defendants did not issue any communications to surgeons who had implanted Device with a recalled polyethylene component or to patients who had received an Device with a recalled polyethylene component until months later in February 2022.

50.    On February 7, 2022, Defendants issued an "Urgent Medical Device Correction" in which it informed health care professionals that:

> After extensive testing, we have confirmed that most of our inserts manufactured since 2004 were packaged in out-of-specification (referred to hereafter as "non-conforming") vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance. **The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer. Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both**

**accelerated wear debris production and bone loss, and/or component fatigue cracking/fracture, all leading to corrective revision surgery.**

*See* Letter from Darin Johnson, President & CEO, Exactech and Sharat Kusuma, Senior Vice President & Chief Medical Officer, Exactech, to Exactech Surgeons, Urgent Medical Device Correction (Feb. 7, 2022) [hereinafter Exactech Recall Letter], attached hereto as Exhibit A.

51.     The "Urgent Medical Device Correction" went on to further state that Defendants were expanding the recall to include all knee arthroplasty polyethylene inserts packed in non-conforming bags regardless of label or shelf life. The components subject to the recall now included: OPTETRAK®: All-polyethylene CR Tibial Components, All-polyethylene PS Tibial Components, CR Tibial Inserts, CR Slope Tibial Inserts, PS Tibial Inserts, HI-FLEX® PS Tibial Inserts; OPTETRACK Logic®: CR Tibial Inserts, CR Slope Tibial Inserts, CRC Tibial Inserts, PS Tibial Inserts, PSC Tibial Inserts, CC Tibial Inserts; and TRULIANT®: CR Tibial Inserts, CR Slope Tibial Inserts, CRC Tibial Inserts, PS Tibial Inserts, PSC Tibial Inserts. *Id.*

52.     It is estimated that a total of 147,732 inserts implanted in the United States since 2004 were produced with non-conforming packaging. *Id.*

53.     Defendants further acknowledged the original Optetrak knee system has shown statistically significant higher overall revision rates compared to other total knee arthroplasties in the Australian, United Kingdom, and New Zealand joint registries. *Id.*

54.     Specifically, reasons for revision associated with polyethylene wear, including loosening, lysis, and pain, were increased three- to seven-fold with the Optetrak total knee replacement combination of the Optetrak-PS/Optetrak, according to the 2021 Australian National Joint Replacement Registry with revision diagnoses related to accelerated polyethylene wear possibly related to the non-conforming packaging. *Id.*

55.     Implanting surgeons were advised in the February 2022 notice to contact patients

previously implanted with recalled components and to schedule an evaluation if the patient is experiencing any new or worsening knee swelling, pain while walking, inability to bear weight, grinding or other noise, instability, or any new symptoms of clicking in the knee. *Id.*

56.    Furthermore, Defendants advised surgeons that revision surgery should be considered for patients who exhibit premature polyethylene wear. *Id.*

57.    Based on Defendants' own representations, since 2004, Defendants manufactured, promoted, and distributed the Device without ensuring the polyethylene components were properly packaged to prevent or minimize oxidation.  At no point until August 2021 did Defendants first modify the packaging in an effort to address this defect.

58.    In approximately 2017–2018, Exactech, Inc. was in the process of being acquired by the Private Equity Group TPG Capital, which in February 2018 successfully completed a merger agreement. As a result, TPG acquired all of the issued and outstanding common stock of Exactech. In connection with the transaction, Exactech's founders, CEO, and certain other management shareholders exchanged a portion of their shares in the transaction, for new equity securities in the post-closing ownership of the Company. *See Exactech Announces Completion of Merger with TPG Capital*, EXACTECH (Feb. 14, 2018), https://www.exac.com/exactech-announces-completion-of-merger-with-tpg-capital (last visited Jan. 21, 2023).

59.    Disclosure of knowledge of the improper packaging and excessive premature failure rates could have harmed this transaction.

60.    Exactech sold and distributed these defective Devices without adhering to the established industry standards for: the processing of UHMWPE, thermal treatment of irradiated UHMWPE, packaging of irradiated UHMWPE, and proper testing of the Devices for oxidation, accelerated wear, degradation, pitting, and delamination. Additionally, Exactech failed to properly

design, manufacture, test, surveil clinical history, and report to regulatory authorities and clinicians

failures of its defective femoral components of its Optetrak and Truliant knee systems. *See* E.B.

GAUSDEN, ET. AL., *Mid-term Survivorship of Primary Total Knee Arthroplasty with a Specific Implant*, BONE JOINT J., 105-B(3): 277-283, Mar. 2023.  Femoral components that improperly

loosen and do not adhere create micromotion and increase risk of higher volumetric polyethylene

wear.

61.     In a March 2023 article in THE BONE & JOINT JOURNAL, a report of a study

conducted at the Hospital for Special Surgery provided that surgeons at that facility saw "an

increase in revision of Optetrak TKAs for aseptic loosening, early and severe polyethylene wear,

osteolysis, as well as component loosening related to cement debonding." *Id.*

62.     Because of Exactech's tortious acts and omission, including but not limited to its

negligence in design and manufacture, including packaging, of its Knee Device inserts, patients

implanted with the Exactech Knee Devices have had to undergo (or likely will have to undergo)

significant revision surgeries to remove and replace the defective devices.

63.     At all times relevant to this action, Defendants were aware of the Devices' propensity

to undergo substantial early polyethylene wear consisting of the degradation and breakdown of the

plastic chemicals causing toxicity to the tissue and bone and component loosening and/or other

failure causing serious complications including tissue damage, osteolysis, and other injuries as well

as the need for revision surgery and its attendant complications in patients.

64.     At all times relevant to this action, Defendants failed to acknowledge the

manufacturing defects in the Device due to poor and inadequate quality assurance procedures and

due to a wanton and reckless disregard for public safety. Defendants also failed to implement or

utilize adequate safeguards, tests, inspections, validation, monitoring and quality assessments to

ensure the safety of the Device.

65. At the time the Device was manufactured and sold to patients, including Plaintiff, the device was defectively manufactured, packaged and unreasonably dangerous, and did not conform to the federal regulations subjecting patients to unreasonable risks of injury.

66. At all times relevant to this action, Defendants' inadequate manufacturing processes also led to material flaws in the quality systems at its manufacturing, packaging, storage and distribution facilities.

67. During manufacture and distribution of the Device, Defendants failed in several ways, including, without limitation, by:

    a. failing to conduct adequate mechanical testing, including oxygen-resistance or other wear testing for the components, subassemblies, and/or finished Device;

    b. failing to test an adequate number of sample devices on an ongoing basis;

    c. failing to take adequate steps to specifically identify failure modes with clarity and to suggest methods to monitor, avoid, and/or prevent further failures;

    d. failing to identify and/or note the significance of any testing that resulted in failure of the Device;

    e. failing to take corrective actions to eliminate or minimize further failures of the Device;

    f. failing to adequately explain packaging specifications for the components, subassemblies, and/or finished Device;

    g. failing to perform adequate quality control before the components, subassemblies, and/or finished Device were distributed;

    h. failing to properly address reports from their sales representatives who

reported their observations while attending revision surgeries where evidence of polyethylene debris and osteolysis was apparent and noted by the surgeons and the sales representatives themselves;

i.    failing to timely implement corrective action and investigations to understand the root cause of these failures while continuing to sell the components knowing they would be implanted into the bodies of thousands of people; and

j.    Becoming aware of the potential cause or causes but unreasonably avoiding informing patients and surgeons and delaying the ability to minimize damages as the devices continued to degrade and do damage in the patients' bodies.

68.    On or before the date of Plaintiff's initial knee replacement surgery, Defendants knew or should have known the Device was failing and causing serious complications after implantation in patients. Such complications included, but were not limited to, catastrophic polyethylene wear including the deposition of plastic particulate wear debris throughout the knee, a high rate of component loosening, and overall early system failure resulting in tissue destruction, osteolysis, and other injuries causing severe pain, swelling, instability and dysfunction in the knee and leg necessitating revision surgery.

69.    Defendants as manufacturers of orthopedic devices know that each surgery, especially a revision surgery, is always more complicated than an initial knee replacement surgery and is fraught with serious risks of infection, anesthesia errors, dislocations and other serious complications that should be avoided.

70.    Defendants, however, ignored reports of early failures of their Device and failed to promptly investigate the cause of such failures or issue any communications or warnings to orthopedic surgeons and other healthcare providers.

71.     Before the date of Plaintiff's initial knee replacement surgery, Defendants knew or should have known that the Device was defective and unreasonably dangerous to patients, that the product had an unacceptable failure and complication rate, and that the product had a greater propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

**JAMES MCNAIR'S IMPLANTS AND REVISION SURGERIES**

72.     On January 2, 2010, Plaintiff JAMES MCNAIR underwent right total knee replacement surgery at the Hospital for Special Surgery in New York, New York where he was implanted with a recalled Optetrak Polyethylene Tibial Insert.

73.     On December 10, 2013, Plaintiff JAMES MCNAIR underwent left total knee replacement surgery at the Hospital for Special Surgery in New York, New York where he was implanted with a recalled Optetrak Polyethylene Tibial Insert.

74.     Plaintiff JAMES MCNAIR is currently scheduled to undergo a left total knee revision surgery on April 20, 2023 at the Hospital for Special Surgery in New York, New York, due to accelerated and preventable wear of the Optetrak Polyethylene Tibial Insert.

75.     Plaintiff JAMES MCNAIR has been informed by his physician that he will also need a right total knee revision surgery due to accelertated and preventable wear of the Optetrak Polyethylene Tibial Insert.

76.     Defendants, through their affirmative misrepresentations and omissions, actively and fraudulently concealed from Plaintiff and Plaintiff's health care providers the true and significant risks associated with the Device and the need to vigilantly do diagnostic procedures to promptly diagnose the insidious process of the toxic polyethylene particles degrading and causing osteolysis.

77.     Defendants know that after the one-year checkup following a total knee arthroplasty, typically patients are not expected to return for monitoring absent problems.  Thus, Defendants knew that—unless they informed surgeons to call their patients back for periodic radiologic monitoring—polyethylene chemical degradation and attendant osteolysis could be occurring unchecked until it reached the stage of severe bone loss.

78.     As a direct, proximate, and legal consequence of the defective nature of the Device as described herein, Plaintiff JAMES MCNAIR has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; soft tissue damage; bone loss; and other injuries presently undiagnosed, which all require ongoing medical care.

79.     As a further direct, proximate, and legal consequence of the defective nature of the Device, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering.

## **TOLLING OF STATUTE OF LIMITATIONS**

**A. Latent Injury**

80.     To the extent it is claimed that Plaintiff suffered symptoms prior to undergoing revision surgery, the statute of limitations is tolled because development of osteolysis, bone loss, and device loosening are latent conditions caused by years of exposure to toxic polyethylene wear debris that could not be appreciated until the date Exactech disseminated the information justifying its recall of the Exactech Knee Devices.

81.     As a plastic, polyethylene wear debris contains chemicals or additives and may contain impurities such as catalyst residues, unreacted monomers, or breakdown products which possess toxic properties that can adversely affect human health. *See* Matthias C. Rillig et al., *The*

*Global Plastic Toxicity Debt*, 55 ENV'T. SCI. & TECH. 2717, 2717–19 (2021).

82.     As described above, such toxic effects on the human body include, but are not limited to, osteolysis, tissue necrosis, and destruction of the bony integration between the component parts of the prosthetic and the patient's anatomy.

83.     Prior to Exactech initiating its recall and disseminating information about the recalls to Plaintiff, technical, scientific, or medical knowledge and information sufficient to ascertain the cause of the failure of the Exactech Knee Devices had not been known.

84.     Thus, Plaintiff exhibited due diligence and did not possess "technical, scientific, or medical knowledge" and information sufficient to ascertain the cause of his injuries until after Exactech recalled their Exactech Knee Devices.

## B. Fraudulent Concealment

85.     Exactech, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff and Plaintiff's healthcare providers the defects in and true and significant risks associated with Exactech's Knee Devices, claiming any failures were due to surgical technique, positioning, or patient characteristics.

86.     Following implantation of the Device, Plaintiff and Plaintiff's healthcare providers relied on Exactech's continued representations that the Device, including their polyethylene components, had excellent long-term clinical outcomes.

87.     Exactech made these representations with knowledge of their falsity, an intent to defraud, and/or disregard for the truth given its knowledge of reports of high failure rates.

88.     Furthermore, following implantation of the Device, Plaintiff and Plaintiff's healthcare providers relied on Exactech to provide them with urgent safety information regarding Exactech's Knee Devices, including recalls, communications regarding defects and increased rates

of failure, and warnings and instructions on how to assess, diagnose, and mitigate risks associated with the defects in these Devices.

89.     Although clinical evidence demonstrated that the polyethylene used in Exactech Knee Devices were failing at a rate higher than promoted, with instances of excessive revision rates due to device loosening and polyethylene wear, Exactech failed to initiate recalls earlier or issue any communications to healthcare providers that Exactech Knee Devices were defective and patients should be monitored.

90.     Until recently, Exactech lacked highly-crosslinked polyethylene for its Knee Devices. Accordingly, without a viable substitute, earlier disclosure of these failure rates could have negatively impacted Exactech's ongoing business and sale to TPG in 2017/2018.

91.     As a result of Exactech's actions, omissions, and misrepresentations, Plaintiff and Plaintiff's healthcare providers were unaware, and could not have reasonably known, learned, or discovered that any Plaintiff's symptoms or radiological findings indicative of a potential problem with Plaintiff's joints were the result of defects in Exactech's Knee Device.

92.     Furthermore, had Exactech not actively concealed evidence of growing reports of accelerated polyethylene wear and Device failures, Plaintiff's surgeon would have not implanted the Devices, and for those patients already implanted with Exactech Devices, their surgeons would have initiated monitoring for device failures at an earlier time.

93.     Such intervention would have led to an earlier diagnosis of loosening and bone loss, and earlier removal of the Exactech Knee Device, thereby reducing damage to bone and tissue.

94.     As a result of Exactech's actions, omissions, and misrepresentations, many individuals underwent revision surgeries during which they received new Exactech polyethylene components, subjecting them to a new exposure to the defective polyethylene and the need for yet

another revision in the following years, while Exactech profited from selling more of its products.

95.     As a result of Exactech's actions, omissions, and misrepresentations, Plaintiff and Plaintiff's healthcare providers were unaware, and could not have reasonably known, learned, or discovered through reasonable diligence, that Plaintiff had been exposed to the risks identified herein, and that those risks were the result of defects in Exactech's Knee Device.

96.     Accordingly, no limitations period should accrue until such time as Plaintiffs knew or reasonably should have known of some causal connection between Plaintiff being implanted with Exactech's Knee Device, and the resulting harm later suffered by Plaintiff as a result and by reason of Exactech's fraudulent concealment.

97.     Additionally, Defendants are equitably estopped from asserting any limitations defense by virtue of their fraudulent concealment and other misconduct as described herein.

98.     Further, the limitations period should be tolled under principles of equitable tolling.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## STRICT LIABILITY—MANUFACTURING DEFECT

99.     Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

100.    Prior to Plaintiff's initial knee surgery, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Device for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

101.    The Defendants had a duty to manufacture the Device in a manner that prevents unreasonable risk of harm or injury to users and patients, including Plaintiff.

102.    The Defendants had a duty to distribute, market, and/or sell the Device without manufacturing and related packaging defects to prevent an unreasonable risk of harm or injury to users and patients, including Plaintiff.

103.    The Devices manufactured by the Defendants were not reasonably safe for their expected, intended, and/or foreseeable uses, functions, and purposes.

104.    The Devices were not reasonably safe as manufactured, packaged, distributed, marketed and/or sold by the Defendants.

105.    The defects in manufacture of the Device were a substantial factor in causing Plaintiff's injuries.

106.    At all times herein mentioned, the Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Device, which was implanted in Plaintiff, such that it was dangerous, unsafe, and defective in manufacture. The defects in manufacture include but are not limited to:

   a.    failure to package the polyethylene components of the Device in vacuum bags that contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) as to prevent the components from undergoing increased oxidation and causing patients to experience substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery;

   b.    the materials used to package the Device were of an inferior grade or quality;

   c.    that the Device as manufactured differed from Defendants' intended specifications;

   d.    that Defendants failed to measure and/or test an adequate number of samples of Devices on an ongoing basis;

   e.    that Defendants failed to take corrective actions to eliminate or minimize further failures of the Device;

f.      that Defendants failed to perform adequate quality control or other such testing on the polyethylene inserts used in the Device to ensure they complied with required specifications and were not prematurely degrading while stored;

g.      failure to select appropriate third parties to package the polyethylene inserts used in the Device;

h.      failure to properly supervise and monitor the packaging of the polyethylene inserts used in the Device;

i.      failure to exercise sufficient quality control to ensure the polyethylene inserts in the Devices were safe for implantation in users and patients and would not degrade abnormally under average and regular use; and

j.      that Defendants violated applicable state and federal laws and regulations; and in all other ways.

107.    Defendants knew or reasonably should have known and been aware that the Devices were defectively manufactured.

108.    The manufacturing defects in the Device existed when the device left the Defendants' control.

109.    Plaintiff's physicians implanted the Device in the manner in which it was intended and recommended to be used, making such use reasonably foreseeable to Defendants.

110.    The Device as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff without substantial change in its condition.

111.    As alleged herein, Defendants knew or had reason to know that the Device caused an increased risk of harm to the Plaintiff and other consumers due to the device's propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

112.    The manufacturing defects of the Device presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when used and operated for the purposes intended by Defendants.

113.    The manufacturing defects of the Device presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when they were used and operated in a manner that was foreseeable to Defendants.

114.    Plaintiff could not, by the exercise of reasonable care, have discovered the manufacturing defect and perceived its dangers or avoided injury.

115.    The Defendants are strictly liable for the defective manufacture of the Device; the distribution, marketing, and/or sale of the defectively manufactured Device; and the injuries sustained by Plaintiff.

116.    By reason of the foregoing acts, omissions and conduct committed by the Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

117.    By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

118.    As a direct, proximate, and legal consequence of the defective nature of the Device as described herein Plaintiff JAMES MCNAIR has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; soft tissue damage; bone loss; and other injuries presently undiagnosed, which all require ongoing medical care.

119.    As a further direct, proximate, and legal consequence of the defective nature of the Device, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering.

120.    Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY—DESIGN DEFECT

121.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

122.    Prior to Plaintiff's initial knee surgery, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Device for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

123.    Defendants had a duty to design and package the Device in a manner that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

124.    Defendants had a duty to distribute, market, and/or sell the Device with a design that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

125.    The design of the Device and corresponding packaging is defective and not reasonably safe for its expected, intended, and/or foreseeable uses, functions, and purposes.

126.    The Device and corresponding packaging are not reasonably safe as designed, distributed, marketed, delivered and/or sold by Defendants.

127.    The defective design of the Device and packaging received by Plaintiff's implanting surgeon was a substantial factor in causing Plaintiff's injuries.

128.    At all times relevant to this action, the Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Device, which was implanted in Plaintiff, such that it was dangerous, unsafe, and defective in design. The defects in the design include but are not limited to:

a.    that the Device has propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients;

b.    failure to design the packaging for the polyethylene components of the Device in vacuum bags that contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) as to prevent the components from undergoing increased oxidation and causing patients to experience substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery;

c.    that the materials used within the Device and packaging were of an inferior grade or quality than advertised and promoted by Defendants;

d.    Defendants failed to conduct adequate testing, including wear or other testing, on components, subassemblies and/or the finished Device as packaged and distributed;

e.    Defendants failed to test an adequate number of samples of Devices on an ongoing basis;

f.    Defendants failed to take adequate steps to specifically identify failure

25

modes with the Device with clarity and to suggest methods to monitor, avoid, and/or prevent further failures;

g.    Defendants failed to identify and/or note the significance of any testing that resulted in failure of the Device;

h.    Defendants failed to take corrective actions to eliminate or minimize further failures of the Device;

i.    Defendants failed to adequately design packaging specifications for the components, subassemblies, and/or the finished Device;

j.    The polyethylene material used in the Device in conjunction with the inferior vacuum bags caused and/or contributed to the devices having a higher failure rate than other similar devices available at the time the Devices were put on the market;

k.    The polyethylene material used in the Device in conjunction with the inferior vacuum bags caused and/or contributed to the devices having a shorter effective lifetime than other similar devices available at the time the Devices were put on the market;

l.    The Defendants' method of designing the polyethylene insert and packaging increased the risk of users and patients suffering from pain, discomfort, injury, and the need for revision surgery; and

m.    that Defendants violated applicable state and federal laws and regulations; and in all other ways.

129.    Defendants knew or reasonably should have known and been aware that the Devices and packaging were defectively designed.

130.    The design defects in the Device and packaging existed when the device left the Defendants' control.

131.    Plaintiff's physicians implanted the Device in the manner in which it was intended and recommended to be used, making such use reasonably foreseeable to Defendants.

132.    The Device as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff without substantial change in its condition.

133.    As alleged herein, Defendants knew or had reason to know that the Device caused an increased risk of harm to the Plaintiff and other consumers due to the device's propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

134.    The Device and packaging as designed carried risks that were outweighed by any utility of the design of the device and packaging because when paired together, the Device and packaging were dangerous to an extent beyond that which would be contemplated by the ordinary consumer. At no time did Plaintiff have reason to believe that the Device and the packaging in which it was received were in a condition not suitable for proper and intended use.

135.    The Device and packaging were defective in design and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff, because the foreseeable risks exceeded or outweighed the purported benefits associated with the device.

136.    Feasible safer alternative designs providing the same functional purpose were available to the Defendants at the time the Device was designed and packaged and offered for sale in the market.

137.    For example, Defendants could have utilized vacuum bags containing a secondary barrier layer containing ethylene vinyl alcohol (EVOH) as to prevent the polyethylene components from undergoing increased oxidation according to their own admissions.

138.    The design defects of the Device and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when used and operated for the purposes intended by Defendants.

139.    The design defects of the Device and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when they were used and operated in a manner that was foreseeable to Defendants.

140.    Plaintiff could not, by the exercise of reasonable care, have discovered these design defects and perceived their dangers or avoided injury.

141.    The Defendants are strictly liable for the defective design of the Device; defective design of the packaging of the Device; the distribution, marketing, and/or sale of the Optetrak Device; and the injuries sustained by Plaintiff.

142.    By reason of the foregoing acts, omissions and conduct committed by the Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

143.    By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

144.    As a direct, proximate, and legal consequence of the defective nature of the Device as described herein, Plaintiff JAMES MCNAIR has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; soft tissue damage; bone loss; and other injuries presently undiagnosed, which all require ongoing medical care.

145.    As a further direct, proximate, and legal consequence of the defective nature of the Device, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional

distress; and pain and suffering.

146.    Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION
### STRICT LIABILITY—FAILURE TO WARN

147.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

148.    Prior to Plaintiff's initial knee surgery, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Device for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

149.    Defendants had a duty to provide adequate warnings regarding the Device in a manner that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

150.    Defendants had a duty to distribute, market, and/or sell the Device with adequate warnings that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

151.    The warnings that accompanied the Device and corresponding packaging were defective, thereby making the product not reasonably safe for its expected, intended, and/or foreseeable uses, functions and purposes.

152.    The Device and corresponding packaging are not reasonably safe as labeled, distributed, marketed, delivered and/or sold by Defendants.

153.    Inadequate labeling accompanying the Device and packaging received by Plaintiff's implanting surgeon was a substantial factor in causing Plaintiff's injuries.

154.    At all times relevant to this action, the Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Device, which was implanted in Plaintiff, such that it was dangerous, unsafe, and defective.

155.    The Device was defective and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff, because the warnings in the instructions for use, operative techniques, directions, marketing and promotional materials, advertisements, white papers, and other communications provided by Defendants or its sales force to physicians and patients with or about the Device failed to adequately convey the potential risks and side effects of the Device and the dangerous propensities of the device, which risks were known or were reasonably scientifically knowable to Defendants.

156.    In particular, Defendants failed to adequately disclose the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, bone loss, osteolysis, and other injuries as well as the need for revision surgery in patients.

157.    Defendants consciously disregarded the increased risks of harm by failing to adequately warn of such risks; unlawfully concealing the dangerous problems associated with implantation of the Device; and continuing to market, promote, sell, and defend the Device until the very recent recall.

158.   Defendants knew or reasonably should have known and been aware that the Devices and packaging contained inadequate warnings.

159.   The inadequate warnings for the Device existed when the device left the Defendants' control.

160.   Plaintiff's physician implanted the Device in the manner in which it was intended and recommended to be used, making such use reasonably foreseeable to Defendants.

161.   The Device as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff without substantial change in its condition.

162.   As alleged herein, Defendants knew or had reason to know that the Device caused an increased risk of harm to the Plaintiff and other consumers due to the device's propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

163.   The Device that was labeled, manufactured, distributed, and sold by the Defendants to Plaintiff was in a defective condition that was unreasonably dangerous to any user or ordinary consumer of the device, including Plaintiff.

164.   The labeling defects of the Device and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when used and operated for the purposes intended by Defendants.

165.   The labeling defects of the Device and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when they were used and operated in a manner that was foreseeable to Defendants.

166.     Plaintiff could not, by the exercise of reasonable care, have discovered these defects and perceived their dangers or avoided injury.

167.     Defendants failed to issue new warnings or initiate a recall in a timely manner as to help minimize the damage and bone loss occurring in patients, including Plaintiff.

168.     The Defendants are strictly liable for providing inadequate warnings accompanying the Device and packaging of the Device; the distribution, marketing, and/or sale of the Device; and the injuries sustained by Plaintiff.

169.     By reason of the foregoing acts, omissions, and conduct committed by the Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

170.     By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

171.     As a direct, proximate, and legal consequence of the defective nature of the Device as described herein, Plaintiff JAMES MCNAIR has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; soft tissue damage; bone loss; and other injuries presently undiagnosed, which all require ongoing medical care.

172.     As a further direct, proximate, and legal consequence of the defective nature of the Device, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering.

173.   Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## NEGLIGENCE

174.   Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

175.   Prior to Plaintiff's initial knee surgery, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Device for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

176.   Prior to, on, and after the dates of Plaintiff's initial knee surgery, and at all times relevant to this action, Defendants had a duty to exercise reasonable care in testing, study, research, design, formulation, manufacture, inspection, labeling, packaging, promotion, advertisement, marketing, distribution, and sale of the Device for implantation into consumers, such as Plaintiff, by physicians and surgeons in the United States.

177.   Prior to, on, and after the dates of Plaintiff's initial knee surgery, Defendants breached this duty and failed to exercise reasonable care and were grossly negligent and careless in the testing, study, research, design, formulation, manufacture, inspection, labeling, packaging, promotion, advertisement, marketing, distribution, and sale of the Device.

178.    Following Plaintiff's initial knee surgery, Defendants breached this duty and failed to exercise reasonable care and were grossly negligent and careless in failing to recall the Device.

179.    At all times material hereto, the Defendants had actual knowledge, or in the alternative, should have known through the exercise of reasonable and prudent care, of the hazards and dangers associated with the Device.

180.    Defendants had access to registry data and were aware of complaints that the Device caused serious complications including but not limited to polyethylene wear and/or other failure causing serious complications including component loosening, tissue damage, osteolysis, bone loss and the need for revision surgery in patients.

181.    Despite the fact that Defendants knew or should have known the Device posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market the Device for implantation into consumers.

182.    Despite the fact that Defendants knew or should have known the Device posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market the Device for implantation into consumers without revising any warning language or issuing an earlier recall.

183.    Defendants failed to advise surgeons and patients of the need for regular follow-up—beyond the ordinary practices after a total knee implant—to promptly detect polyethylene degradation and osteolytic failure and timely revise the device to prevent or at least minimize bone loss, osteolysis and related injuries.

184.    Defendants failed to exercise due care under the circumstances, and their gross negligence and recklessness includes the following acts and omissions:

    a.  Negligently failing to properly package the polyethylene components of the Device;

b.  Negligently failing to select appropriate third parties to package the polyethylene inserts used in the Device;

c.  Negligently failing to properly supervise and monitor the packaging of the polyethylene inserts used in the Device;

d.  Negligently failing to properly and thoroughly select the material that would be used in the packaging of the Device;

e.  Negligently failing to properly and thoroughly select the materials that would be used in the Device;

f.  Negligently failing to properly and adequately test the Device and their attendant parts before releasing the devices to market;

g.  Negligently failing to conduct sufficient post-market testing and surveillance of the Device;

h.  Negligently failing to adequately prevent, identify, mitigate, and fix defective designs and hazards associated with the Device in accordance with good practices;

i.  Negligently designing, manufacturing, marketing, advertising, distributing, and selling the Device;

j.  Continuing to negligently manufacture, and distribute the Device after the Defendants knew or should have known of their adverse effects and/or the increased early onset failure rates;

k.  Negligently designing, manufacturing, marketing, advertising, distributing, and selling the Device to consumers, including Plaintiff, without an adequate warning of the dangerous risks of the Device;

l.  Negligently failing to notify and warn the public, including Plaintiff, and physicians of reported incidents involving injury and the negative health effects attendant to the use of the Device;

m. Negligently misrepresenting the safety of the Device;

n.  Negligently failing to provide warnings, instructions or other information that accurately reflected the risks of early failure of the Device;

o.  Negligently failing to provide warnings, instructions or other information that accurately reflected the risks of early degradation of the polyethylene substance in the Device;

p.  Negligently failing to exercise due care in the advertisement and promotion of the Device;

q. Negligently disseminating information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the high early failure rate associated with the implantation of the Device;

r. Aggressively promoting the Device without proper warnings of the risk of early failure or material degradation in the average user;

s. Aggressively promoting the Device even after Defendants knew or should have known of the unreasonable risks from implantation;

t. Negligently failing to warn consumers, doctors, users and patients that the Device would contain polyethylene materials not properly packaged and/or in accordance with Defendants' specifications;

u. Negligently diminishing or hiding the risks associated with the implantation of the Device;

v. Negligently failing to recall the Device at an earlier date and institute a process to have patients notified; and

w. Negligently violating applicable state and federal laws and regulations; and in all other ways.

185. Defendants knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warning of the risks and dangers of the Defective Implants, and otherwise distributing the Device.

186. By reason of the foregoing acts, omissions, and conduct committed by the Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

187. By reason of the foregoing acts, omissions, and conduct committed by Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

188.     As a direct and proximate result of Defendants' acts and omissions, including their failure to exercise ordinary care in the design, formulation, testing, manufacture, labeling, sale, and distribution of the Device, Plaintiff JAMES MCNAIR was implanted with the Device and was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

189.     As a further direct, proximate, and legal consequence of Defendants' acts and omissions, including their failure to exercise ordinary care in the design, formulation, testing, manufacture, labeling, sale, and distribution of the Device, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering.

190.     Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### FIFTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION

191.     Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

192.     Prior to Plaintiff's initial knee surgery, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Device for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

193.    Defendants owed a duty to orthopedic surgeons, other healthcare providers and to consumers of the Device, including Plaintiff, to accurately and truthfully represent the risks of the Device. Defendants breached their duty by misrepresenting and/or failing to adequately warn Plaintiff's orthopedic surgeon, the medical community, Plaintiff, and the public about the risks of the Device, including the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients, which Defendants knew or in the exercise of diligence should have known.

194.    The Defendants, as the designers, manufacturers, sellers, promoters, and/or distributors of the Device knew, or reasonably should have known, that health care professionals and consumers of the Device would rely on information disseminated and marketed to them regarding the product when weighing the potential benefits and potential risks of implanting the Device.

195.    The Defendants, as the designers, manufacturers, sellers, promoters, and/or distributors of the Device knew, or reasonably should have known, that the patients implanted with Device would suffer early failure and require revision surgery because the information disseminated by Defendants and relied upon by health care professionals and consumers, including Plaintiff, was materially inaccurate, misleading, or otherwise false.

196.    The Defendants failed to exercise reasonable care to ensure that the information they disseminated to health care professionals and consumers concerning the quality and longevity of the Device was accurate, complete, and not misleading. As a result, Defendants disseminated information to health care professionals and consumers that was materially inaccurate, misleading, false, and unreasonably dangerous to consumers such as Plaintiff.

197.    Among Defendants' numerous misrepresentations and misleading omissions are Defendants' assurances that the Device was safe, had an excellent performance record, and did not have a greater propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

198.    Despite their knowledge of serious problems with the Device, Defendants urged their sales representatives to continue marketing the Device, and distributed medical literature, white papers, non-peer-reviewed studies, and other communications to surgeons in an effort to mislead them and the general public about the risks associated with the Device and instead create the image and impression that the Device was safe.

199.    Defendants made such statements even after they became aware of numerous and serious complications with the Device. Defendants did not reveal (and instead concealed) their knowledge of numerous and serious complications and other bad data.

200.    Defendants made these representations with the intent to induce reliance thereon, and to encourage purchase and implantation of the Device.

201.    The misrepresentations made by Defendants, in fact, were false and known by Defendants to be false at the time the misrepresentations were made.

202.    Misrepresentations spanned a number of years, but also include the critical time period of 2017–2018 when the company was in the process of being acquired by the Private Equity Group TPG Capital, which in February 2018 successfully completed a merger agreement. As a result, TPG acquired all of the issued and outstanding common stock of Exactech. In connection with the transaction, Exactech's founders, CEO and certain other management shareholders exchanged a portion of their shares in the transaction, for new equity securities in the post-closing

ownership of the Company. *See Exactech Announces Completion of Merger with TPG Capital*, EXACTECH (Feb. 14, 2018), https://www.exac.com/exactech-announces-completion-of-merger-with-tpg-capital (last visited Jan. 21, 2023).

203.    After the merger in 2018, it still took four years for Defendants to reveal the product defects and their health consequences to the medical community and to the patients, including Plaintiff, even though the key officers of Exactech generally continued with their roles in the newly merged company.

204.    Defendants failed to exercise ordinary care in making their representations concerning the Device and, in the manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce of the Device.

205.    By reason of the foregoing acts, omissions and conduct committed by the Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

206.    By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

207.    As a direct and proximate result of Defendants' acts and omissions, including Defendants' negligent misrepresentations regarding the Device, Plaintiff JAMES MCNAIR was implanted with the Device and was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

208.    As a further direct, proximate, and legal consequence of Defendants' acts and omissions, including Defendants' negligent misrepresentations regarding the Device, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering.

209.    Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

210.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

211.    Prior to Plaintiff's initial knee surgery, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Device for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

212.    Defendants expressly warranted that the Devices, including the Optetrak Comprehensive Total Knee System, were safe and effective orthopedic devices.

213.    Defendants promised that the Device had excellent long-term clinical outcomes and that "surgeons and patients can have every confidence in the performance and longevity of the Optetrak knee system."

214.    At the time Defendants manufactured, marketed, sold and/or distributed the Devices, they knew that the devices were intended for human use, and that Plaintiff was a foreseeable user of the Device.

215.    The express warranties represented by Defendants were a part of the basis for Plaintiff's use of the Devices, and he and his surgeon relied on these warranties in deciding to use the Device.

216.    At the time of the making of the express warranties, Defendants had knowledge of the purpose for which the Device was to be used and warrantied the same to be in all respects safe, effective and proper for such purpose.

217.    The Device did not conform to these express representations, as demonstrated by the fact that Plaintiff's implant failed prematurely due to polyethylene wear of the tibial insert which necessitated him to undergo revision surgery.

218.    At the time Defendants marketed, sold and/or distributed the Devices, Defendants expressly warranted that the total knee replacement systems, including all of their component parts, were safe and merchantable for their intended use.

219.    Plaintiff JAMES MCNAIR and his implanting physician reasonably relied upon Defendants' express warranties.

220.    Plaintiff JAMES MCNAIR used the Device for its intended purpose, and in a reasonable, foreseeable manner.

221.    The Device manufactured and sold by Defendants, did not conform to Defendants' express representations because the Device caused serious injury to Plaintiff when used as recommended and directed.

222.    As a direct and proximate result of Defendants' acts and omissions, including breach of express warranty, Plaintiff JAMES MCNAIR was implanted with the Device and was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

223.    As a further direct, proximate, and legal consequence of Defendants' acts and omissions, including breach of express warranty, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; and pain and suffering.

224.    Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## SEVENTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY

225.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

226.    Prior to Plaintiff's initial knee surgery, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Device for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

227.    Defendants impliedly warranted, through its marketing, advertising, distributors and sales representatives, that the Device was of merchantable quality, and fit for the ordinary purposes and uses for which it was sold.

228.   In fact, the Device was not of merchantable quality nor fit for the ordinary purposes and uses for which it was sold and did not meet the expectations of consumers.

229.   The Device manufactured and supplied by Defendants was not of merchantable quality and was not fit for the ordinary and/or particular purpose for which it was intended as physicians and patients would expect the components to be properly packaged and stored as to avoid premature degradation of component materials.

230.   Plaintiff JAMES MCNAIR and/or his physician reasonably relied upon the skill and judgment of Defendants as to whether the Device was of merchantable quality and safe for its intended and particular use and purpose.

231.   Contrary to such implied warranties, the Device was not of merchantable quality or safe for its intended and particular use and purpose, because Defendants failed to package the polyethylene components of the Device in vacuum bags containing a secondary barrier layer containing ethylene vinyl alcohol (EVOH) as to prevent the components from undergoing increased oxidation and causing patients to experience substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery.

232.   As a direct and proximate result of Defendants' acts and omissions, including breach of implied warranties, Plaintiff JAMES MCNAIR was implanted with the Device and was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

233.   As a further direct, proximate, and legal consequence of Defendants' acts and omissions, including breach of implied warranties, Plaintiff has sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of

earning capacity; mental and emotional distress; and pain and suffering.

234.    Defendants acted intentionally, recklessly, and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiffs to recover punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## LOSS OF CONSORTIUM AND SERVICES

235.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

236.    At all relevant times, Plaintiff ELDORADO MCNAIR was and is the lawfully wedded wife of Plaintiff JAMES MCNAIR, and as such, was and is entitled to the services, consortium and society of Plaintiff JAMES MCNAIR.

237.    As a result of the foregoing strict products liability, negligence, and breach of warranties by the defendants, ELDORADO MCNAIR, was deprived of the services, consortium, and society of Plaintiff JAMES MCNAIR.

238.    As a direct, proximate, and legal consequence of Defendants' wrongful conduct as described herein, whether through strict liability or negligence, Plaintiff ELDORADO MCNAIR has suffered and will continue to suffer the loss of support, companionship, service, love, affection, society, intimate relations, and other elements of consortium all to the detriment of their marital relationship for which Plaintiff ELDORADO MCNAIR is entitled to compensatory damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as

the Court deems proper.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendants, and each of

them, individually, jointly, and severally, as follows:

a. Judgment in favor of Plaintiffs and against all Defendants, for damages in such amounts as may be proven at trial;

b. Compensation for both economic and non-economic losses, including but not limited to medical expenses, loss of earnings, disfigurement, pain and suffering, mental anguish, loss of consortium and emotional distress, in such amounts as may be proven at trial;

c. Punitive and/or exemplary damages in such amounts as may be proven at trial;

d. Attorneys' fees and costs;

e. Interest; and

f. Any and all further relief, both legal and equitable, that the Court may deem just and proper.

Dated: April 10, 2023

By:

Respectfully submitted,

*s/Ellen Relkin, Esq.*
**WEITZ & LUXENBERG P.C.**
ELLEN RELKIN (ER-9536)
700 Broadway
New York, New York 1003
Telephone: (212) 558-5500
E-mail: erelkin@weitzlux.com
*Attorney for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury.

Dated: April 10, 2023                    Respectfully submitted,

                        By:    *s/Ellen Relkin, Esq.*
                               **WEITZ & LUXENBERG P.C.**
                               ELLEN RELKIN (ER-9536)
                               700 Broadway
                               New York, New York 10003
                               Telephone: (212) 558-5500
                               E-mail: erelkin@weitzlux.com
                               *Attorney for Plaintiffs*